WAGGONER, Respondent, *v.* GLACIER COLONY
OF HUTTERITES, et al., Appellants.
No. 9184.
Submitted March 27, 1953. Decided July 2, 1953.
258 Pac. (2d) 1162.

Messrs. Hoffman & Cure, Great Falls, for appellants.
Messrs. Frisbee & Moore, Cut Bank, for respondent.
Mr. H. B. Hoffman and Mr. S. S. Frisbee argued orally.

MR. JUSTICE BOTTOMLY:

This is an appeal from that certain order made and filed January 14, 1952, denying the motion of the defendant Glacier Colony of Hutterites, an association of persons, for an order vacating and setting aside its default and the judgment entered therein against and not permitting it to answer and defend the action.

This action was commenced by plaintiff for the purpose of recovering damages of some $51,000 arising out of an automobile accident which is alleged to have occurred February 8, 1951. Complaint was filed September 11, 1951, and together with summons was served on the defendant association September 13, 1951.

Praecipe for default was filed and default of the defendant entered October 4, 1951, and judgment in the sum of $15,974.08 was made and entered October 24, 1951.

November 5, 1951, motion to vacate and set aside the default and judgment so entered, together with the supporting affidavits of John M. Entz and Paul P. Entz, members of the defendant colony, and H. B. Hoffman, their attorney, were filed and defendant's answer tendered for filing.

November 5, 1951, the judge, upon presentation of the motion and said affidavits and tender of an answer and good cause ap-

pearing, filed an order staying all proceedings on the judgment or on execution until further order of the court. Thereafter and on stipulation of counsel an order was made setting the hearing on defendant's above motion for November 27, 1951.

November 27, 1951, affidavit of John P. Moore and affidavit of Selden S. Frisbee, with exhibits attached, were filed in opposition to the motion. Hearing was had November 27, 1951, at which testimony was introduced. Thereafter and on January 14, 1952, the court entered an order denying defendant's motion. This appeal is from such order.

The affidavits of John M. Entz and Paul P. Entz, recite, *inter alia:* That on September 13, 1951, the sheriff of Glacier County delivered a copy of the summons and complaint to John M. Entz; that he and other members of the Glacier County colony conferred about the matter; that then he and Paul P. Entz, another member of Glacier colony, and a Mr. O'Haire hurried to the office of Selden S. Frisbee and John P. Moore, in Cut Bank, Montana, the attorneys for the plaintiff in the action; that they were met by John P. Moore; that John M. Entz and Paul P. Entz and Mr. O'Haire then and there informed the said John P. Moore of the fact, as the fact is, that Peter Mandel, the driver of the truck referred to in the plaintiff's complaint, was not at the time of the accident referred to, and never has been a member of the Glacier colony, nor a resident of Glacier County or of Montana; but on the contrary, he was a resident of Alberta Province in Canada and that the truck involved in said accident which the said Peter Mandel was driving was not the property of the Glacier colony, but was the property of Elm Spring colony, a resident of said Province of Alberta; that they then and there informed and stated to said John P. Moore that at the time of said accident, Peter Mandel was a visitor to the Glacier colony and at the time of the accident he was not engaged by Glacier colony or any member thereof, nor was he at the time of the accident engaged in any business of the Glacier colony; that thereupon the said John P. Moore stated to deponents that they could burn the papers that the sheriff had served or throw them in the

wastebasket; that he would have to get out other papers or change the papers before he could do anything; that deponents and the Glacier colony put full faith and confidence in said statement made by Mr. Moore, and expected that he would change his suit in accordance with the facts that deponents gave him and that the deponents and Glacier colony were under no responsibility to answer said papers which deponents and Glacier colony considered to be of no force or effect because of said statement by Mr. John P. Moore, and because thereof neither Glacier colony nor anyone acting in its behalf conferred or consulted with any other attorney at law until on or about Saturday, October 27, 1951, when deponents conferred with their attorneys Hoffman and Cure in Great Falls, Montana, who advised deponents and Glacier colony that its default had already been entered against it; that Hoffman and Cure had not seen the complaint in the action or a copy thereof until October 29, 1951; that deponents and Glacier colony were lulled into a sense of security by the statement and representation aforesaid made by said John P. Moore, and but for those statements they would have immediately contacted their said attorneys to appear and answer plaintiff's complaint; that after fully and fairly stating the facts to H. B. Hoffman, they have been advised by their said counsel and fully believe that they have a good and meritorious defense to said action.

The affidavit of defendant's counsel, H. B. Hoffman, states, *inter alia:* That the deponents John M. Entz and Paul P. Entz are older members of the Hutterite faith and are the two persons most familiar with the matters and facts pleaded in the complaint and in defendant's tendered answer and defense; that H. B. Hoffman is a member of the law firm of Hoffman & Cure; that the affiants, John M. Entz and Paul P. Entz, consulted Hoffman's law firm October 29, 1951, and supplied the firm such facts as they had at that time; that default and judgment was entered against the defendant October 24, 1951; that H. B. Hoffman and his law firm first learned that judgment had been given and entered against defendant October 31, 1951, and

thereupon Hoffman and his firm promptly began preparation of the papers and proceedings to have the default and judgment vacated; that after John M. Entz and Paul P. Entz had fully and fairly stated to Hoffman the facts concerning this action, upon such statement and upon the information which Hoffman obtained thereafter, he has advised defendant that it has a valid and substantial defense to said action upon the merits, and that such defense is fully and truly set forth in the verified answer, a copy of which is attached to Hoffman's affidavit as exhibit B and that leave is requested to file such answer.

The affidavit of John P. Moore recites: ''That on or about the 13th day of September, 1951, Mr. William F. O'Haire of Sunburst, Montana, came to the office of Selden S. Frisbee, Attorney at Law at Cut Bank, Montana, and advised Mrs. Florence Meyers a secretary in said office that he wanted to talk to Selden S. Frisbee. Mr. O'Haire was accompanied by two Hutterites. Mrs. Meyers told Mr. O'Haire that Mr. Frisbee was not in, and asked if he would like to talk to myself. Mr. O'Haire assented and was shown into my office together with the two Hutterites whom he introduced to me as John M. Entz and Paul P. Entz, and as leading members of the Glacier colony of Hutterites.

''Mr. O'Haire, acting as spokesman and advisor for the Hutterites, stated that he had come to this office with the two Hutterites in order to explain to Mr. Frisbee that a mistake had been made in serving Summons and Complaint upon the Glacier Colony of Hutterites in the present action, and asked me to advise Mr. Frisbee of this contention. Mr. O'Haire and the two Hutterites appeared in a rather jovial mood. I thereupon told Mr. O'Haire and the two Hutterites that I was not handling the present case, and had nothing to do with it, but that I could be glad to refer their remarks to Mr. Frisbee upon his return. Mr. O'Haire and the two Hutterites then went on to explain to me that the defendant, Peter Mandel was not a resident of, nor a member of, and did not live at, the Glacier Colony of Hutterites, but that he was a resident of the Elm Spring Colony in Alberta, Canada. They further stated that Peter Mandel was not working

for the Glacier Colony of Hutterites when his collision with O. R. Waggoner occurred.

"To these remarks I replied that I was not handling the case and had nothing to do with it, but that if what they said was true, then Mr. Frisbee might possibly have to sue the Canadian Colony of Hutterites of which O'Haire and the two Hutterites were claiming that Peter Mandel was a resident. I further told Mr. O'Haire and the Hutterites in specific terms that from my knowledge of Mr. Frisbee's thorough investigation of this case, I was convinced that the Glacier Colony of Hutterites was the residence of Peter Mandel and that Peter Mandel was working for said Glacier Colony of Hutterites at the time of his collision with O. R. Waggoner.

"O'Haire and the two Hutterites then, condescendingly, told me that Mr. Frisbee and I were misinformed, reaffirming their statements concerning the residence of Peter Mandel. One of the Hutterites then laid on my desk the copies of the Summons and Complaint which were served on the Glacier Colony of Hutterites, saying that I might as well take them back because they were served on the wrong colony.

"I told them that, as far as I was concerned, they could do anything that they chose with the copies of the Summons and Complaint but, for their own good, they had better keep them, see that they were turned over to their leaders and attorneys and act in accordance with those papers' directions, because, as far as I knew, the suit which Mr. Frisbee had filed was proper in all respects. The Hutterites thereupon picked up the copies of the Summons and Complaint from my desk and retained them.

"The Hutterites then asserted that, anyway, Waggoner was asking too much money as damages in his Complaint, and were admonished by Mr. O'Haire to refrain from further discussion of damages since that was a matter which would come up later on.

"I then told Mr. O'Haire and the two Hutterites Mr. Frisbee had spent many months in an effort to obtain a satisfactory settlement with their insurer, and had done everything possible to obtain a peaceful disposition of the case; but, that since their

insurer had disclaimed any liability after long months of stalling, he was forced to file suit against them.

"The Hutterites then started to leave my office, and Mr. O'Haire again requested me to advise Mr. Frisbee of their contention that wrong colony had been served. I agreed to do so.

"The following morning when Mr. Frisbee arrived at his office, I advised him of my conversation with Mr. O'Haire and two Hutterites as above stated. I told Mr. Frisbee that Mr. O'Haire had requested me to inform him of the contention of the Hutterites to the effect that the wrong colony had been served. I further told Mr. Frisbee that I told Mr. O'Haire and the Hutterites that I believed that the proper colony was being sued and that they had better proceed accordingly. I also told Mr. Frisbee that I had told the Hutterites that, if what they were saying was true, then he might have to sue the Elm Spring Colony.

"Mr. Frisbee specifically asked if I told the Hutterites that any changes would be made in the action or that the action would be dismissed. Mr. Frisbee also asked if the Hutterites or Mr. O'Haire had requested that he call them. I told Mr. Frisbee that I did not tell them that the action would be changed or dismissed, that Mr. O'Haire and the Hutterites had merely asked that I pass along their contention that the wrong colony had been served, to him, and that O'Haire and the Hutterites had not asked that he call or get in touch with them.

"I did not at any time in my conversation with Mr. O'Haire and the Hutterites tell them that the present suit would be dropped and that a different suit would be filed by reason of their statements to me. I merely told them that, if, what they were contending was true, then Mr. Frisbee might have to sue a different colony. I specifically told Mr. O'Haire and the Hutterites that I believed that the correct colony had been served, because of my knowledge of the matters discovered in the investigation of Mr. Frisbee and that they had better proceed accordingly."

The testimony received at the hearing follows rather closely the above affidavits.

The question presented is: Do the statements of fact set forth in the above affidavits together with the other testimony received at the hearing disclose such inadvertence, mistake, surprise or neglect as will excuse the defendant and entitle it to have the default and judgment set aside?

R. C. M. 1947, sec. 93-3905, in part provides: "The court may, in furtherance of justice * * * upon such terms as may be just, relieve a party or his legal representative from a judgment, order, or other proceeding taken against him through his mistake, inadvertence, surprise, or excusable neglect; provided, that application therefor be made within reasonable time, but in no case exceeding six months after such judgment, order, or proceeding was taken."

Here the judgment was given and entered October 24, 1951, and defendant's motion, supporting affidavits and proposed answer were filed 12 days thereafter, to wit, on November 5, 1951, being within a reasonable time.

Almost immediately upon the service of the summons and complaint on John M. Entz, as treasurer of the Glacier colony of Hutterites, he and other leaders of the colony held a conference, following which Mr. O'Haire, John M. Entz and Paul P. Entz hurried to the law office of Selden S. Frisbee and John P. Moore at Cut Bank, Montana, the names of said attorneys having been endorsed on the complaint as attorneys for plaintiff. Arriving at the office they asked to see attorney Frisbee but were informed that Mr. Frisbee was absent, whereupon they talked to Mr. Moore, whose name appears on the complaint as one of the plaintiff's attorneys. Mr. O'Haire, John M. Entz and Paul P. Entz explained to Mr. Moore that a mistake had been made in serving summons and complaint upon the Glacier colony of Hutterites; that the person, Peter Mandel, the driver of the truck referred to in the complaint, was not at the time of the accident, and never had been, a member of the Glacier colony nor a resident of Glacier County, Montana, but was and is a resident of Alberta Province, Canada; that the truck involved in the accident which Peter Mandel was driving was not the property of

Glacier colony, but was the property of Elm Spring colony of the Province of Alberta; that Peter Mandel at the time of the accident was a visitor at Glacier colony but was not engaged by Glacier colony on any business of said colony.

From the statements set forth in the affidavit of Mr. Moore it would appear that there is very little dispute as to what the Hutterites told Mr. Moore. The apparent confusion comes from the understanding received by John M. Entz and Paul P. Entz from what attorney Moore told them.

Here we have simple farm folk who, it is apparent from the record, know little if anything about legal matters, procedures or requirements. Promptly upon being served with complaint and summons the leaders of the defendant association went to the office of the attorneys whose names were endorsed on the complaint as attorneys for plaintiff. As a result of the conversation with Mr. Moore, one of the attorneys for plaintiff, the members of the association having the business in hand, received the impression that the plaintiff's attorneys would investigate the truth of their assertions and that if found correct, the plaintiff's attorneys would bring another action against the Elm Spring colony, which they considered was the proper party. It is very apparent that the impression which they received from the conversation with plaintiff's attorney was that it would not be necessary for them to see an attorney. We know that laymen, especially those of meager understanding of legal processes and matters, are often misled and often get an entirely different meaning and idea from such a conversation than does one who is trained in the legal field. Compare Pember v. Meyer, Co. Ct., 45 N. Y. S. (2d) 673.

In Reynolds v. Gladys Belle Oil Co., 75 Mont. 332, 243 Pac. 576, 581, the court said: "Aside from the statutory ground of excusable fault in the part of the movant, it is held that a party should be relieved from a default 'where there is a legal and sufficient excuse for the delay, as where the delay was due to the action of the court, or is attributable to the plaintiff's own fault, or irregular action in the case.' 34 C. J., [Judgments] 164;

Sweeney v. O'Dwyer, 45 Misc. 43, 90 N. Y. S. 806; Royce v. Mott, 1 How. Proc. (N. Y.) 50. This rule seems to be recognized in this state in the following cases: Whiteside v. Logan, 7 Mont. 373, 17 Pac. 34; In re Davis' Estate, 15 Mont. 347, 39 Pac. 292; Anaconda Min. Co. v. Saile, 16 Mont. 8, 39 Pac. 909, 50 Am. St. Rep. 472; Greene v. Rowan, 29 Mont. 263, 74 Pac. 456; Hauser v. Newman, 39 Mont. 252, 102 Pac. 334, and Brown v. Weinstein, 40 Mont. 202, 105 Pac. 730, in each of which cases there appears the element of fault on the part of the plaintiff, misleading the defendant into a position where default was taken against him, and in each case this court unhesitatingly upheld the right of the defendant to relief from the default so caused.''

This court laid down a general rule in such cases in the early case of Benedict v. Spendiff, 9 mont. 85, 22 Pac. 500, wherein it was said: ''The exercise of the mere discretion of the court ought to tend, in a reasonable degree at least, to bring about a judgment on the very merits of the case; and, when the circumstances are such as to lead the court to hesitate upon the motion to open the default, it is better, as a general rule, that the doubt should be resolved in favor of the application.''

Chief Justice Brantly, speaking for the court in Nash v. Treat, 45 Mont. 250, 122 Pac. 745, 746, Ann. Cas. 1913E, 751, said: ''Each case must be determined upon its own facts; and, when the motion is made promptly and is supported by a showing which leaves the court in doubt or upon which reasonable minds might reach different conclusions, the doubt should be resolved in favor of the motion.''

'' 'But judgments by default are not favored, and the trial court in passing upon a motion to set aside a default judgment should exercise the same liberal spirit which prompted the Legislature in enacting section 9187, Revised codes [1935, now R. C. M. 1947, sec. 93-3905]'.''. Davis v. Hubbard, 120 Mont. 45, 179 Pac. (2d) 533, 534, quoting from Madson v. Petrie Tractor & Equipment Co., 106 Mont. 382, 77 Pac. (2d) 1038.

''No great abuse of discretion by the trial court in refusing to set aside a default need be shown to warrant a reversal,

for the courts universally favor a trial on the merits.'' Brothers v. Brothers, 71 Mont. 378, 230 Pac. 60, 61; Patterson v. Patterson, 120 Mont. 127, 179 Pac. (2d) 536.

This is a remedial provision and under the terms of the Code ▮ which requires it to be liberally construed with a view to effect its objective and promote justice, it is best observed by disposing of causes upon their substantial merits, rather than with strict regard to technical rules of procedure. The discretion of the court ought always to be exercised in conformity with the spirit of the law, and in such a manner as will subserve, rather than impede or defeat, the ends of justice; regarding mere technicalities as obstacles to be avoided, rather than as principles which effect is to be given in derogation of substantial right and justice. Compare: Farmers Co-operative Ass'n. v. Roper, 57 Mont. 42, 188 Pac. 141.

This court has quoted with approval the following from Griswold Linseed Oil Co. v. Lee, 1 S. D. 531, 47 N. W. 955, 36 Am. St. Rep. 761, wherein the South Dakota court had under consideration a like statute: ''The provisions of this section are exceedingly liberal in their terms, remedial in their character, and were evidently designed to afford parties a simple, speedy, and efficient relief in a most worthy class of cases. The power thus conferred upon courts to relieve parties from judgments taken against them by reason of their mistake, inadvertence, surprise, or excusable neglect should be exercised by them in the same liberal spirit in which the section was designed, in furtherance of justice and in order that cases may be tried and disposed of upon their merits. When, therefore, a party makes a showing of such mistake, inadvertence, surprise, or excusable neglect, applies promptly for relief after he has notice of the judgment, shows by his affidavit of merits that *prima facie* he has a defense, and that he makes the application in good faith, a court could not hesitate to set aside the default, and allow him to serve an answer upon such terms as may be just under all the circumstances of the case.'' Greene v. Montana Brewing Co., 32 Mont. 102, 79 Pac. 693, 695.

This court also said in the Greene case: "Inadvertence is defined as (1) the quality of being inadvertent; lack of headfulness or attentiveness; inattention; negligence; (2) an effect of inattention; a result of carelessness; an oversight, mistake, or fault from negligence. Webster's International Dictionary. Negligence or inadvertence directly traceable to a party litigant or his attorney, no less excusable than that disclosed by this record, has many times been held sufficient to warrant the opening of a default, and trial courts have not infrequently been reversed for their refusal to set aside defaults under such circumstances."

There does not seem to be anything technical or peculiar in the word "surprise" as used in the courts of equity. Where a court of equity relieves on the ground of surprise, it does so upon the ground that the party has been taken unawares, and that he acted without due deliberation and under confused impression." 1 Story, Eq. Jur., 14th Ed., sec. 184, note.

Mistake is defined as "some unintentional act, omission, or error arising from ignorance, surprise, imposition, or misplaced confidence." Black's Law Dictionary, DeLuxe Ed.; 1 Story, Eq. Jur., sec. 155.

R. C. M. 1947, sec. 12-202, provides in part: "The codes establish the law of this state respecting the subjects to which they relate and their provisions and all proceedings under them are to be liberally construed with a view to effect their objects and to promote justice."

This court has repeatedly declared that default judgments are not favored and that it is the policy of the law to have *every case tried on its merits*. "While slight abuse of discretion in refusing to set aside a default judgment is sufficient to justify a reversal of the order [citing cases], only in exceptional cases will this court disturb the action of a trial court in re-opening a default." See Nelson v. Lennon, 122 Mont. 506, 206 Pac. (2d) 556, 557; Continental Supply Co. v. Price, 126 Mont. 363, 251 Pac. (2d) 553.

It is our opinion that the circumstances above stated, the intent of the statutes and decisions above cited, the showing

made and the defense pleaded in the answer tendered by the defendant are sufficient to entitle defendant to the relief sought. Under the facts and circumstances in this case, the court erred in refusing to set aside the default and the judgment so made and entered. This suit should be tried on its merits and to that end the default and judgment are vacated and set aside, the order and judgment appealed from are reversed and the cause is remanded to the district court for further proceedings consistent with this opinion, with leave granted the defendant to serve and file an answer and defend against the action.

MR. CHIEF JUSTICE ADAIR and ASSOCIATE JUSTICES FREEBOURN, ANGSTMAN and ANDERSON, concur.